IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| PETER POWDERHAM, an individual,<br><br>Plaintiff,<br><br>v.<br><br>SYNERGY WORLDWIDE, INC., a Utah corporation, and NATURE'S SUNSHINE PRODUCTS, INC., a Utah corporation,<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER**<br><br>Case No. 2:08-cv-548 CW |

In this action, Plaintiff Peter Powderham has sued Defendants Synergy Worldwide Inc. and Nature's Sunshine Products, Inc. (together, "Synergy"). Mr. Powderham had a consulting agreement with Synergy to lead Synergy's business in Europe which Synergy terminated. Mr. Powderham asserts various causes of action arising from that termination, including breach of contract and breach of the covenant of good faith and fair dealing. Now before the court is Synergy's motion for summary judgment on all of Mr. Powderham's claims. For the reasons set forth below, that motion is GRANTED in part and DENIED in part.

## BACKGROUND

Mr. Powderham is a resident of the United Kingdom. Synergy is a network marketing company with its headquarters in Provo, Utah. Synergy offers nutritional and personal care products that are sold through a network of distributors. On November 1, 2006, Synergy and Mr. Powderham entered into a three-year agreement for consulting services involving the business

1

development of the Synergy European Markets or "SEM."  Mr. Powderham was to be compensated at a rate of $10,000 per month plus a percentage of monthly net sales.

Prior to entering into the Consulting Agreement with Mr. Powderham, Synergy did not sell products in Europe.  Under the Consulting Agreement, Mr. Powderham was to assist in Synergy's entry into the European market.  In furthering this goal, Mr. Powderham had two main responsibilities: locating a distributor base and supporting the corporate entity.  His efforts were to include developing a business plan, overseeing the product registration process, assisting in warehousing decisions, making recommendations for SEM office staffing, developing a product marketing strategy, opening the business operation in the SEM, preparing budgets and any other services as requested.  Mr. Powderham reported primarily to Synergy President Dan Norman and Synergy Founder Dan Higginson.  (Mr. Norman was Director of Operations until 2007 when he was named President.)  On Mr. Powderham's recommendation, Synergy hired two people to support Mr. Powderham on an operational level.

Under the Consulting Agreement, Mr. Powderham agreed to perform the "Services in a timely, professional and courteous manner," and with "care, skill and diligence."  (Consulting Agreement ¶ 3.)  The Consulting Agreement provided that the "Company may terminate Consultant's Services to Company at any time by giving thirty (30) days' written notice if Company is dissatisfied with Consultant's performance of the Services."  (*Id.* ¶ 6.)

The launch of Synergy's business in Europe happened in July 2007.  During early 2007 or the "pre-launch" period, Mr. Powderham toured Europe with the goal of recruiting key distributor leaders from among his contacts and meeting with them during the tour prior to

having products ready for them.  Mr. Powderham believed that establishing a distributor network in Germany and Austria was the critical first step in establishing the SEM, so his first approach was to drive business into those countries as quickly as possible and work from there.  Mr. Powderham and Synergy believed that Mr. Powderham would need help in Germany due to the high volume of potential business there and their belief that German is the preferred language for business there.  Since Mr. Powderham does not speak German, Synergy anticipated hiring someone to help cover Germany and Austria.

In May of 2007, while Mr. Powderham was in pre-launch touring, Mr. Powderham told Mr. Norman and Mr. Higginson that he had "had enough" and was going to quit.  Mr. Powderham said this while he was in his car on his way through Austria.  He was angry at the time about what he perceived as Synergy's missteps in the pre-launch process.  Mr. Norman later testified that this incident negatively impacted his perception of Mr. Powderham.  After speaking to Mr. Norman and Mr. Higginson, Mr. Powderham decided not to quit, but expressed a desire to renegotiate his agreement.

Mr. Powderham continued to work on the launch of the SEM.  Early administrative problems created difficulties with the launch.  There were problems with processing credits cards, signing up distributors and product registration issues.  Mr. Powderham assigns full responsibility for these issues with Synergy, while Synergy asserts that most or part of the blame for them should go to Mr. Powderham.  In August of 2007, one of Synergy's German distributors complained of internet glitches that made distributor sign up difficult.  Mr. Powderham's response was that the problem should have been dealt with by corporate.

There was also a question as to whether passport identification was required for distributor sign up in the UK.  Mr. Powderham argued that this requirement would make it difficult to do business with Synergy, and that corporate should take care of the issue.  Mr. Higginson filed an affidavit in which he asserts that Mr. Powderham's approach to this issue fell short of Synergy's expectations and created friction.  Mr. Higginson also asserts that he received complaints from some German distributors about Mr. Powderham's management abilities.

Mr. Powderham's interactions and communications with Synergy personnel were difficult and often strained.  As an example, Mr. Powderham once asked for a sponsorship change for one of the incoming distributors.  There was some confusion as to the reason for the change and the identity of the individual, and Synergy's compliance department became involved.  Kevin Hale of that department sent an email reminding Mr. Powderham that the policy and procedures must be followed and that the department needed more information before a change could be made.  Mr. Powderham became defensive and confrontational and sent a communication to Mr. Hale stating that he "personally started the entire process of building the" European team and therefore wanted the sponsorship changed; that he did "NOT make these requests OUTSIDE of appropriate practice or recommendation;" and that "for the most part" his "advice has been ignored in all matters pertaining to Europe development." (Higginson Aff. ¶ 30.)  He concluded by stating "it would be helpful if a 'pro active and positive' approach was taken regarding WHY I HAVE ASKED FOR THIS! If not,  please  ignore this request and I will advise this Belgium leader to find another company !!!! AND, DO NOT REFER TO MY REQUEST EITHER NOW OR IN THE FUTURE AS STRONG ARM TACTICS." (*Id.*)

In June 2007, Synergy engaged Thorsten Mueller, a German-speaking consultant, to help manage the Germanic market. Prior to that time, no one had been helping Mr. Powderham with that market. Mr. Mueller was to report to Mr. Powderham and was charged with continuing to build Synergy's business in Germany. Mr. Powderham was unhappy with Synergy's decision to hire Mr. Mueller, feeling imposed upon and upset that Synergy rejected his suggestions for the position.

Mr. Powderham was also irritated that Mr. Mueller was being paid more than Mr. Powderham. In response to his complaint on this point, Synergy agreed to pay Mr. Powderham an advance on expected sales commissions of $5,000 per month beginning in August 2007. The company expected Mr. Powderham would eventually earn the advanced amounts though monthly sales. Ultimately, Synergy's sales in Europe did not meet the projected sales figures during Mr. Powderham's employment. The parties dispute the extent of Mr. Powderham's responsibility for the gap between expected and actual sales.

After Synergy hired Mr. Mueller, Mr. Powderham continued to express his unhappiness regarding Mr. Mueller. Mr. Powderham felt that Mr. Mueller did not respect Mr. Powderham's role. Mr. Powderham also believed that Synergy told Mr. Mueller that Mr. Mueller was to replace Mr. Powderham. Mr. Powderham further thought that Mr. Mueller would not take instructions from him or be controlled by him. Mr. Powderham complained about Mr. Mueller to Mr. Norman, Mr. Higginson and other Synergy senior executives on numerous occasions.

In November of 2007, Mr. Powderham, Mr. Higginson and Mr. Mueller had a meeting in Vienna at which Mr. Higginson reminded Mr. Mueller that Mr. Powderham was responsible for

Europe and that Mr. Powderham was Mr. Mueller's superior.  In December 2007, Mr. Powderham thought that the company was going to terminate its agreement with Mr. Mueller, but it did not.  Mr. Norman later testified that at that time, Mr. Powderham gave Synergy an ultimatum that either Mr. Powderham or Mr. Mueller had to go.  Mr. Norman stated that Synergy decided that firing Mr. Mueller at that time would have been a catastrophe.  Following that incident, Mr. Powderham requested that Mr. Mueller no longer report to him.  Brady Jex of Synergy's sales department then became Mr. Mueller's supervisor.  Mr. Norman was dissatisfied with how Mr. Powderham handled the relationship with Mr. Mueller.

Mr. Powderham's increasing unhappiness in his role led to Mr. Powderham expressing possible interest in a distributorship.  On January 10, 2008, after receiving the proposed compensation terms for a distributorship, Mr. Powderham reversed his position.  Mr. Powderham then told Synergy that "[t]his is not an emotional outburst or a threat, but please don't irritate me too much further."  (Powderham Dep. Ex. 5.)  On January 31, 2008, Mr. Powderham again requested that Synergy propose a distributorship position stating, "I think it is time for you to propose my being placed in the field and being allowed to work from that position." (Powderham Dep. Ex. 6).  He added, "[p]lease don't protract this process any further and please don't irritate me any further." (*Id.*)  Mr. Powderham believed it was appropriate for him to say he did not want Synergy to irritate him because he was a consultant, not a Synergy employee.

Synergy responded by sending a detailed distributorship proposal in February 5, 2008.  In the email transmitting that proposal to Mr. Powderham, Mr. Norman stated:

> First off I want to thank you for everything you've done thus far as the VP of Europe.  We recognize the great contribution you've made and understand the fact that we started with

6

> nothing. You've given us a business in Europe.
>
> I understand your frustration over the past month. We made decisions that you didn't agree with but you've remained professional... I really appreciate this. We want you to be part of Synergy for the long term and as discussed a distributorship is the best option.
>
> . . . After working with you that last year and understanding your impact and experience, I don't think it will be a problem for you to create weak leg volume. You amazed me when you brought in nearly 20,000 distributors during the pre-launch.

(Powderham Dep. Ex. 7.) When asked at his deposition if these statements were true, Mr. Norman did not deny that they were. Instead, Mr. Norman asserted that the statements were mere small talk, and he made them in the context of trying to convince Mr. Powderham to give up his role as lead SEM consultant and accept a distributorship.

Mr. Powderham did not read the distributorship proposal, nor did he intend to sign it. Instead, Mr. Powderham responded that he could earn more elsewhere and requested that Synergy "propose a substantial severance arrangement," concluding that "[i]t is time to conclude matters and part amicably." (*Id.*)

By a letter dated March 28, 2008, Synergy gave 30 days notice of the termination of Mr. Powderham's consulting services agreement. According to Mr. Powderham, he was not surprised that he was terminated, but rather, he was surprised by the manner in which it was done. He expected a severance package offer. The termination letter stated as reasons for the termination that "1. You have achieved lower than expected sales in UK, Netherlands, Germany and Austria. 2. You have a poor working relationship with key distributors in Germany. 3. You have failed to perform the Services in a manner expected by the Company." (Powderham Dep. Ex. 11.)

Mr. Norman testified to some specifics with regards to the three numbered items in the termination letter.  For example, as to the second point, Mr. Norman testified that he had received feedback from a top leader in Germany who had complained that it had been a long time since he had seen Mr. Powderham.  Nevertheless, a primary focus of Synergy's complaint was that Mr. Powderham did not speak German, a fact known to Synergy when it hired him.  As to the third point, Mr. Norman pointed to the "tone" of Mr. Powderham's "e-mail to employees and others that we worked with and his attitude, he wasn't performing as we would have expected." (Norman Dep. at 52.)  Mr. Norman testified that Synergy expected Mr. Powderham "to be able to work with everyone … work civilly at all times and get things done." (*Id.* at 52-53.)

Mr. Powderham disputes the validity of the reasons cited in the termination letter.  As for the lower-than-expected sales, Mr. Powderham asserts that those are mostly attributable to failures by Synergy.  Mr. Powderham also denies ever being told that he had a poor working relationship with key German distributors before the letter.  Finally, Mr. Powderham contends that Synergy's expectations as to issues such as "tone" were not made clear in the Consulting Agreement.

Mr. Powderham also asserts that he had a conversation with Mr. Norman after Synergy sent the termination letter.  According to Mr. Powderham, he asked Mr. Norman why the had sent him the letter instead of calling him and why the letter contained reasons for termination that were not true.  In response, avers Mr. Powderham, Mr. Norman said that the termination letter was "written to comply with the terms of the contract." (Powderham Decl. ¶ 5.)

Mr. Powderham brought this action in this court in July 2008 based on diversity

jurisdiction. In his complaint, Mr. Powderham asserts claims of breach of contract, breach of the implied covenant of good faith and fair dealing, promissory estoppel, unjust enrichment and fraud. After a period of discovery, Synergy brought the present motion for summary judgment seeking judgment in its favor of all of Mr. Powderham's claims.

**ANALYSIS**

**I.      Summary Judgment Standard**

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c)(2). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses. . ." *Celotex v. Catrett*, 477 U.S. 317, 324 (1986). Rule 56(a) accordingly allows a party claiming relief to move, "with or without supporting affidavits, for summary judgment on all or part of [a] claim." Fed.R.Civ.P. 56(a)(2).

The party moving for summary judgment bears the initial burden of showing "that there is an absence of evidence to support the non-moving party's case." *Celotex*, 477 U.S. at 325. This burden may be met merely by identifying portions of the record which show an absence of evidence to support an essential element of the opposing party's case. *Johnson v. City of Bountiful*, 996 F. Supp. 1100, 1102 (D. Utah 1998).

Once the moving party satisfies its initial burden "the burden then shifts to the nonmoving party to make a showing sufficient to establish that there is a genuine issue of material fact regarding the existence of [the disputed] element." *Id.* Under Rule 56(e)(2) a nonmovant that

would bear the burden of persuasion at trial must "go beyond the pleadings and 'set forth specific facts' that would be admissible in evidence in the event of a trial from which a rational trier of fact could find for the nonmovant." *Adler v. Wal-Mart Stores*, 144 F.3d 664, 671 (10th Cir. 1998). The specific facts put forth by the nonmovant "must be identified by reference to an affidavit, a deposition transcript or a specific exhibit incorporated therein:" mere allegations and references to the pleadings will not suffice. *Thomas v. Wichita Coca-Cola Bottling*, 968 F.2d 1022, 1024 (10th Cir. 1992). In reviewing the record, courts must "examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Lopez v. LeMaster*, 172 F.3d 756, 759 (10th Cir. 1999).

**II.    Synergy's Motion**

Synergy argues that each of Mr. Powderham's claims fails, either as a matter of undisputed fact or on the legal merits. Synergy's reasoning and Mr. Powderham's responses will be analyzed below. Because the Consulting Agreement contains a Utah choice of law provision, the court will apply Utah law here.

**A.    Breach of Contract and Breach of the Duty of Good Faith and Fair Dealing**

Synergy argues that it did not breach the Consulting Agreement or the covenant of good faith and fair dealing by terminating Mr. Powderham. In short, Synergy argues that it has proven beyond factual dispute that it terminated the Consulting Agreement because it was dissatisfied with Mr. Powderham. Mr. Powderham argues that there is an issue of fact as to whether Synergy was genuinely dissatisfied with his work.

Neither side has pointed the court to any Utah precedent in which a party is alleged to have

breached a contract that allows the party to terminate if dissatisfied with the other's performance. Synergy points to cases from outside of Utah that hold that the standard for determining whether a party was dissatisfied is based on judging the subjective assessment of the party to be satisfied. *See*, *e.g.*, *Silvestri v. Optus Software Inc.*, 814 A.2d 602, 606 (N.J. 2003). Synergy also concedes that even under the subjective standard, the party's "dissatisfaction, to justify the discharge of the employee, must be real and not pretended, capricious, mercenary, or the result of a dishonest design." *Towson Univ. v. Conte*, 862 A.2d 941. 949 (Md. 2003). In other words, the dissatisfaction must not be "feign[ed]," but rather "honest[] and in good faith." *Id.* Mr. Powderham adopts these standards in his briefing on this motion.

It appears that the parties are incorrect as to the standard that would apply under Utah law. After reviewing several Utah cases independently, the court concludes that Utah uses an objective standard for judging contractual dissatisfaction. For example, in *Prince v. Elm Inv. Co., Inc.*, 649 P.2d 820, 825 (Utah 1982), the Utah Supreme Court stated that "[w]here a contract provides that the matter of approval of performance is reserved to a party, he must 'act fairly and in good faith in exercising that right. He has no right to withhold arbitrarily his approval; there must be a reasonable justification for doing so.'" (Citation omitted.) *See also Uintah Basin Med. Ctr. v. Hardy*, 179 P.3d 786, 789-90 (Utah 2008) (using objective standard for interpreting "just cause" terminations) and *Smith v. Grand Canyon Expedition Co.*, 84 P.3d 1154, 1159 (Utah 2003) ("When one party to a contract retains power or sole discretion in an express contract, it must exercise that discretion reasonably and in good faith.") (quoting *Cook v. Zion's First Nat'l Bank*, 919 P.2d 56, 60 (Ut. Ct. App. 1996)).

The court concludes that applying an objective standard is appropriate in this case both as a matter of Utah law and as a question of contract interpretation. Reading the Consulting Agreement, that court finds that Synergy and Mr. Powderham did not expect that Synergy could terminate Mr. Powderham before the end of the contractual term for any reason. Rather, the Consulting Agreement contains a limiting provision allowing Synergy to terminate the contract early only if Synergy was "dissatisfied with [his] performance of the Services." If that clause meant that Synergy could terminate the contract for any reason, it would be an illusory provision. Instead, it is clear that to show dissatisfaction under this contract, Synergy must articulate reasons consistent with the expectations both parties had at the time of contracting. Moreover, those reasons must be tied to Mr. Powderham's performance of the services. To allow Synergy to terminate for a subjective reason, rather than an objective one, would deny Mr. Powderham the limitation he bargained for when he agreed to the Consulting Agreement.[1]

The court concludes that Synergy has not shown that it is entitled to summary judgment. As mentioned, Synergy asserts that it is factually undisputed that Synergy was, in good faith, dissatisfied with Mr. Powderham's performance. Synergy points to the three reasons set out in the termination letter as the sources of its asserted dissatisfaction. That is, Synergy asserts that sales in Europe were lower than expected, that Mr. Powderham had problems with key distributors in Germany, and that Mr. Powderham performed below Synergy's expectations, mainly because of

---

[1] The court would reach the same conclusion were it to apply the "subjective" standard as qualified in the cases both Mr. Powderham and Synergy rely upon in their arguments. Upon careful reading of those cases, it seems clear to the court that although the cases refer to the standard as subjective, the requirements imposed require largely objective proof. Given those requirements, any characterization of the standards as subjective must be questioned.

his difficult personal style and at times combative interactions with Synergy.

Mr. Powderham responds that there are facts that put into dispute whether Synergy was genuinely and/or reasonably dissatisfied with his performance. In particular, he points to the email in which Mr. Norman acknowledges that Mr. Powderham created the market in Europe and expresses amazement in Mr. Powderham's recruitment of 20,000 distributors pre-launch. Mr. Powderham also argues that Mr. Norman essentially admitted that Synergy was not sincere in the reasons it had given, but that the letter was instead written by Synergy's legal department only to fulfill the Consulting Agreement's dissatisfaction requirement. Mr. Powderham also asserts that it could be found that Synergy has the bad faith motive of promoting Mr. Mueller over Mr. Powderham as the reason for terminating Mr. Powderham.

Mr. Powderham also offers competing factual reasons for each source of Synergy's asserted dissatisfaction. That is, he contends that there are facts that tend to show that Synergy's own actions accounted for the disappointing initial sales in Europe and some of the German distributors' unease, and that Synergy was aware of these failures. Mr. Powderham also argues that a fact finder could conclude that Synergy's complaints about his personal style and interactions with German distributors are *post hoc* justifications, since at the time they purportedly arose, he did not hear anything about them.

The court agrees with Mr. Powderham that a reasonable jury could conclude based on all the circumstances that Synergy's dissatisfaction was feigned, unreasonable, or in bad faith. Initially, each of the three reasons posited by Synergy for its dissatisfaction are open to different interpretations by reasonable people. First, Synergy has pointed to some conduct by Mr.

Powderham during his time as a consultant could be construed as less than professional and therefore dissatisfactory. But the court cannot agree that a reasonable person would be compelled to find that Synergy's asserted dissatisfaction with that behavior is reasonable or in good faith. To begin with, the record is devoid of any contemporaneous communications, either internally or to Mr. Powderham, that expressed Synergy's dissatisfaction over the cited incidents. Moreover, a reasonable fact finder could conclude that it is reasonable to give a consultant working to create an entirely new market some leeway in his emotional state. Accordingly, a fact finder could conclude that Mr. Powderham's overall performance might have been objectively satisfactory even considering the various outbursts cited by Synergy.

Similarly, a fact finder could conclude that Synergy did not objectively have cause to be dissatisfied with Mr. Powderham's interactions with German distributors. A fact finder could decide that Synergy expected some level of difficulty in the initial stages with German distributors. Synergy knew, for example, that Mr. Powderham did not speak German and was engaged in a time- and energy- consuming undertaking. Moreover, Mr. Norman acknowledge in his deposition testimony that part of his unhappiness with Mr. Powderham was that fact that he did not speak German. This fact could not have been a reasonable basis for termination because Synergy knew at the time it hired Mr. Powderham that he did not speak German. Neither Synergy nor Mr. Powderham could have had a reasonable expectation at the time of contracting that Mr. Powderham's inability to speak German could be a basis for dissatisfaction in his performance.

Finally, while the initial sales were apparently disappointing, there is a factual dispute as to why that was so. Both sides acknowledge that starting up a new market entails difficulties and

14

expectations may not be met right away. Moreover, a fact finder could credit Mr. Powderham's explanations for why it was Synergy's fault that business was initially slow. A reasonable fact finder, then, could conclude that Synergy either knew it was largely its own fault that sales were low or that it was unreasonable to blame Mr. Powderham for the low level of sales.

Moreover, the circumstances as a whole do not satisfy the court that it is beyond dispute that Synergy's termination was in good faith. As the starting point, Synergy itself talked Mr. Powderham out of quitting in May 2007. For about the next year, Mr. Powderham engaged in extensive efforts in the pre launch and launch of the SEM. Around the time the SEM business was launched, Synergy hired Mr. Mueller. Mr. Mueller was not Mr. Powderham's choice to assist him in the key markets of Germany and Austria, which could reasonably raise questions about Synergy's motives for the hire. Moreover, Synergy retained Mr. Mueller over Mr. Powderham's numerous complaints about him. Mr. Powderham twice discussed with Synergy becoming a distributor. Mr. Powderham then requested a severance package on his contract under which, by the court's count, would have entitled Mr. Powderham to work for about 20 more months (March 2008-October 2009) at either $10,000 or $15,000 a month plus a percentage of sales. It was only at that point that Synergy asserted to Mr. Powderham that it was dissatisfied with his services and terminated the contract.

The reasonableness of questioning Synergy's good faith objective dissatisfaction is bolstered by two pieces of evidence. First is the e-mail Mr. Norman sent Mr. Powderham in February 2008. That email expresses gratitude to Mr. Powderham for establishing the European market, lauds Mr. Powderham for acting professionally, and expresses amazement at Mr.

Powderham's accomplishment of recruiting almost 20,000 distributors. While Mr. Norman characterizes these statements as merely trying to "butter up" Mr. Powderham to take a distributorship, a fact finder is not bound by that characterization. Further, Mr. Norman does not disavow the truth of those statements. These statements could reasonably call into question the sincerity, reasonableness, and good faith nature of Synergy's decision to terminate Mr. Powderham.

Second is Mr. Norman's reported verbal admission to Mr. Powderham that Synergy was trying to comply with the contractual language in giving grounds for its dissatisfaction in the termination letter. If a fact finder believed that Mr. Norman had made that statement, it could lead the fact finder to conclude that the reasons were not given in good faith.

As a note in conclusion, the court expresses no opinion here about whether Synergy's expressed dissatisfaction with Mr. Powderham was genuine, reasonable, or in good faith. The only inquiry is whether the undisputed facts compel such a conclusion. For the reasons set forth above, the court concludes that they do not. Accordingly, Synergy is not entitled to summary judgment in its favor that it did not breach the Consulting Agreement and its motion with respect to that count is DENIED.

The parties agree that the court should use the same reasoning in analyzing Mr. Powderham's breach of the covenant of good faith and fair dealing claim as it did for the breach of contract claim. The court agrees and for the same reasons judgment is denied to Synergy on the breach of contract claim, judgment is DENIED to Synergy on the good faith and fair dealing claim.

### B. Other Claims

In addition to the contract-related claims, Mr. Powderham brought claims of promissory estoppel, unjust enrichment and fraud. In his opposition to Synergy's motion on those claims, however, Mr. Powderham has conceded that these claims are not valid. Accordingly, summary judgment is GRANTED in favor of Synergy on these claims.

## CONCLUSION AND ORDER

Based on the foregoing discussion, Defendants' motion for summary judgment is DENIED with respect to Mr. Powderham's breach of contract claim and claim for breach of the covenant of good faith and fair dealing and GRANTED for the other three claims.

The court notes that some previously scheduled events, including the pre-trial conference and trial have been continued pending the outcome of this motion. The parties are hereby directed to confer on a schedule for all remaining events. (Questions about the court's calender should be directed to the courtroom deputy.) The parties shall submit their stipulated scheduling order, or if they cannot agree, their proposed orders, within 30 days of the filing of this Order.

DATED this 12th day of March, 2010.

BY THE COURT:

_____
Clark Waddoups
United States District Judge